

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00091-CR

_____

RODERICK RYDELL MINTER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 28061

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Following a bench trial, Roderick Rydell Minter was found guilty of aggravated assault with a deadly weapon. After finding a deadly weapon enhancement to be true, the trial court sentenced Minter to fourteen years' imprisonment. Minter appeals, maintaining that the evidence was insufficient to support the guilty verdict and that the trial court's judgment included a typographical error. Because (1) sufficient evidence supports the guilty verdict, but (2) the judgment contains a typographical error, we modify the judgment and affirm it, as modified.

On the afternoon of June 26, 2018, while Nathaniel Lee McDonald, Minter's cousin, was mowing the lawn at Oak Hill Baptist Church using a riding lawnmower, he was shot in the mouth with a .22 caliber rifle. Minter lived behind the church, and a loaded .22 caliber rifle, with a sock over the barrel, was later found at his home.

At trial, McDonald testified that he had known Minter "[a]ll his life." According to McDonald, Minter was much younger than he was. McDonald said that, while he was mowing and just before he got shot, he had seen Minter's aunt, Mildred Battle,[1] north of McDonald's location, but "running east, back toward [Minter]'s house . . . waiving her hands in the air." Minter said that he could not hear what Battle was saying due to the noise coming from the lawnmower. Right about that time, McDonald hit the flowerbed with the lawnmower. As he turned his head to see what he had done, the bullet hit him in the right side of his jaw. McDonald turned around and noticed that Battle had stopped running. McDonald said that his

---

[1]Battle lived next door to Minter and was also related to McDonald.

jaw dropped, that is, it had become "unhinged" from his body. According to McDonald, after he was shot, he drove away to avoid getting shot again. A second shot missed.

By the time McDonald had gotten back to the church parking lot, his son had arrived. Shortly after that, McDonald's wife contacted the police, and McDonald was transported by ambulance to the hospital. McDonald said that he did not see Minter shoot him but believed he had, because "the shot came from [Minter's] property."[2] He also stated that Minter had been upset with him, because, a few years ago, McDonald had blown grass shavings on Minter's property while he was mowing. On cross-examination, McDonald conceded that it was not unusual for individuals living in the area to fire rifles or shotguns.

McDonald's son, Nathaniel McDonald, Jr. (Nathaniel), testified that, on the day of the incident, he had been outside helping his father change the blades on the mower. On the way back to his nearby house, Nathaniel saw Minter "going down the trail" toward his aunt Battle's house. According to Nathaniel, he could see Minter well, and Minter was carrying a .22 rifle, which "he carried . . . everywhere."[3] Nathaniel said that by the time he arrived inside the house, he could hear that McDonald had started mowing. Nathaniel explained, "First I heard a shot, and then I heard [Minter's] auntie holler what are you doing, and then I heard a second shot." Nathaniel then heard McDonald yell and drive the mower down the road. Nathaniel said that, in the immediate aftermath of the shooting, only Minter, McDonald, Battle, and he were in the area

---

[2]McDonald testified that the gunshots were "coming from the northeast[,]" which was the area in which Minter lived. In addition, Texas Ranger Stacy McNeal, who investigated the shooting, said that the shots "[m]ost likely" came "from the north, northeast," that Minter lived "directly back to the east," and that his aunt lived "north of the church."

[3]Nathaniel estimated that he had seen Minter with the rifle "a little over an hour" before McDonald was shot, and he believed the two of them were about 150 yards apart.

3

and that Minter was carrying a rifle. According to Nathaniel, McDonald told him that it was Minter who had shot him. Nathaniel also testified that no one else could have been the shooter.

In addition, Nathaniel explained that he also had had problems with Minter, stating that Minter had previously hidden in the bushes and pointed his rifle at Nathaniel. According to Nathaniel, Minter behaved in this manner several times, though he had no reason to threaten him.

John Warren,[4] a nearby neighbor, said that, later, the day of the incident, Minter had visited Warren's house, did not have a weapon at that time, and seemed to be in a good mood. Warren also said that he did not hear any gunshots that day but learned about the shooting "after the fact."

Minter's testimony contradicted much of the above. Minter testified that Nathaniel was "lying" about seeing Minter running with a rifle, denying that he carried a rifle on that occasion or ran from the scene. Minter also claimed that he had not previously hidden in the bushes, with a gun, waiting for Nathaniel. Minter stated that he had heard a person mowing that day but that it was not McDonald. He also contradicted McDonald's testimony that Minter had been angry at him for blowing grass in his yard.

According to Minter, he had not shot, or even been in possession of, a gun on the day of the incident. On the other hand, McNeal testified that Minter told Deputy Draper, who transported Minter to jail, that he had been shooting a gun earlier that day. During McNeal's interview, however, Minter denied shooting a gun that day. No gunshot residue was found on

---

[4]Warren, Minter, the McDonalds, and Battle were all related.

Minter's hands, and no shell casings were found in the area. Minter conceded that he owned two .22 rifles and some shotguns.[5]

*(1)    Sufficient Evidence Supports the Guilty Verdict*

Minter contends that the evidence was insufficient to identify him as the person who shot McDonald. We disagree.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). In either a bench trial or a jury trial, legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Matlock v. State*, 20 S.W.3d 57, 61 (Tex. App.—Texarkana 2000, pet. ref'd). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* In this case, the State alleged that on or about June 26, 2018, Minter "did then and there intentionally, knowingly, and recklessly cause bodily injury to Nathaniel McDonald by shooting him with a firearm, and the

---

[5]In his interview with investigators, Minter said that he had several weapons in his home but that some of them were not functional.

defendant did then and there use or exhibit a deadly weapon, namely a firearm[,] during the commission of the assault."

Here, Nathaniel testified that he saw Minter with a .22 rifle a short time before the shooting took place. Nathaniel stated that Minter often carried a .22 rifle, and Minter admitted during his interview and at trial that he owned multiple weapons, including two .22 rifles. During the search of Minter's house, a loaded .22 rifle was found with a sock over the barrel. Further, McDonald testified that just before he was shot, he had seen Battle running toward Minter's house, waving her hands and yelling. Although McDonald could not hear what Battle was saying, Nathaniel testified that he had heard Battle yell, "What are you doing?" In addition, multiple witnesses testified that the shots came from the northeast, that is, the direction of Minter's property. Further, although Minter denied having any former confrontations with McDonald about the way he mowed the church yard, McDonald said that Minter had been frustrated with him in the past for blowing grass shavings onto Minter's yard. While one might find this to be a petty complaint, and certainly not something to warrant such aggressive behavior, Nathaniel testified that, on more than one occasion and for no reason, Nathaniel had returned home to find Minter beside a tree or in a bush pointing a rifle at McDonald. Nathaniel testified that it was not possible that anyone else could have shot at McDonald that day.

Minter claimed that he was at Warren's house at or around the time McDonald was shot. Yet, Warren testified that Minter did not come to his home until around six p.m., which would have given Minter plenty of time to shoot McDonald, get rid of any gunshot residue on his body, and pick up any shell casings.

Minter's testimony contradicted much of the other evidence presented at trial, and he even contradicted himself. As the State contends, "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (citing *Graham v. State*, 566 S.W.2d 941, 951 (Tex. Crim. App. 1978); *United States v. Cano-Guel*, 167 F.3d 900, 905 (5th Cir. 1999)). Moreover, it is within the province of the fact-finder to judge the credibility of the witnesses and the weight to be given to their testimony, and it may reconcile or resolve conflicts in the testimony, rejecting or accepting such portions as it sees fit. *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). The trial court, as the fact-finder, was entitled to accept the State's version of the facts and to reject Minter's version. *Moore v. State*, 804 S.W.2d 165 (Tex. App.—Houston [14th Dist.] 1991, no pet.)

"Circumstantial evidence is as probative as direct evidence in establishing guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In drawing reasonable inferences, the trier of fact "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). It is true that much of the evidence in this case would be considered circumstantial and, while each piece of evidence, alone, would be insufficient to support a guilty verdict, when we review all the evidence in the light most favorable to the trial court's judgment, we find that the fact-finder could have found the essential elements of the charged offense

7

beyond a reasonable doubt, including that Minter was the shooter.  *See Williamson*, 589 S.W.3d at 297.

We overrule this point of error.

*(2)     The Judgment Contains a Typographical Error*

Minter also contends that the trial court's judgment erroneously references a plea of not true to an enhancement allegation and a finding of true in the judgment, although the indictment did not include such an enhancement allegation but, instead, contained a deadly-weapon allegation.  Minter contends that the judgment should be reformed to correct the error.  We agree.

In the indictment, the State alleged that Minter committed aggravated assault with a deadly weapon by "intentionally, knowingly, and recklessly caus[ing] bodily injury to Nathaniel McDonald by shooting him with a firearm, and that [Minter] did then and there use or exhibit a deadly weapon, namely a firearm[,] during the commission of the assault."[6]  After hearing the evidence, the trial court orally stated that it believed the State had met its burden of proof beyond a reasonable doubt and found Minter guilty "as charged in the indictment."  However, the trial court also orally found "as true the enhancement paragraph alleging the discharge of a firearm or the use or commission of a firearm during this event."[7]

---

[6]By statute, a firearm is considered a deadly weapon per se.  *See* TEX. PENAL CODE ANN. § 1.07(17)(A).

[7]At his initial arraignment held on October 16, 2018, Minter was asked only if he desired to plead guilty or not guilty to the offense as charged in the indictment, to which Minter responded, "Not guilty."  However, just before trial began, Minter again entered a not guilty plea to the charged offense, but the trial court stated, "It may be a stretch here but to the allegation that a deadly weapon was used during the commission of the offense, how do you plead to that, true or not true?"  Minter responded, "Not true."

8

In its written judgment, the trial court (1) made an affirmative deadly-weapon finding—a firearm,[8] (2) stated that Minter pled not true to the first enhancement paragraph, and (3) made a finding of true to the first enhancement paragraph. Yet, Minter is correct that the inclusion of the enhancement paragraph language was error.[9] This is because Minter's indictment did not allege an enhancement paragraph[10] but, instead, alleged a deadly-weapon allegation which, according to the trial court's judgment, was adequately proven by the State.[11]

An appellate court has the power to correct and reform the judgment of a trial court to make the record speak the truth when it has the necessary information to do so or to make any appropriate order as the law and the nature of the case may require. TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992). Here, the record supports modification of the judgment regarding Minter's plea to, and the trial court's finding on, a non-existent enhancement paragraph. Accordingly, we sustain Minter's second point of error and modify the trial court's judgment to reflect Minter's plea to the first enhancement paragraph to be "N/A" and the trial court's finding of true on the first enhancement paragraph to be "N/A."

---

[8]As in the case before us now, an affirmative finding of a deadly weapon was properly before the trial court because "the indictment specifically allege[d] the words "deadly weapon" in describing the weapon used and the verdict reads guilty "as charged in the indictment." *Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985). Moreover, Section 42A.054, subsections (c) and (d), of the Texas Code of Criminal Procedure *requires* the trial court to enter an affirmative finding in its judgment. Among other things, the entry of a deadly weapon finding in a judgment affects a defendant's parole eligibility. *See* TEX. GOV'T CODE ANN. § 508.145(d).

[9]Minter contends that the error in the trial court's judgment was a clerical one, and he is correct.

[10]*See* TEX. PENAL CODE ANN. § 12.42.

[11]Minter does not claim that the State presented insufficient evidence to support the trial court's deadly-weapon finding.

Accordingly, we modify the trial court's judgment to reflect Minter's plea to the first enhancement paragraph to be "N/A" and the trial court's finding of true on the first enhancement paragraph to be "N/A." We affirm the trial court's judgment, as modified.


Josh R. Morriss, III
Chief Justice


Date Submitted:     December 28, 2020
Date Decided:       January 6, 2021

Do Not Publish